*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

DWAYNE ANTHONY DUPREE,

Defendant-Appellant.

UNPUBLISHED
November 21, 2019

No. 339627
Wayne Circuit Court
LC No. 16-008974-02-FC

Before: CAMERON, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

Defendant was convicted by a jury of second-degree murder, MCL 750.317, conspiracy to commit first-degree murder, MCL 750.157a, MCL 750.316, interference in a criminal case, MCL 750.122, felon in possession of a firearm, MCL 750.227f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to serve concurrent prison terms of 50 to 75 years for the second-degree murder conviction, life without parole for the conspiracy to commit first-degree murder conviction, 10 to 25 years for the interference in a criminal case conviction, and 5 to 20 years for the felon in possession of a firearm conviction, and a consecutive sentence of two years for the felony-firearm conviction. Defendant appeals as of right, and we affirm.

In 2010, David Matlock shot Darryl Waller, who survived. Matlock hid from law enforcement until he was arrested in December 2014. He was arrested with Michael Alexander (his nephew) and Calvin Watson after the police stopped Watson's vehicle. The police discovered Matlock's outstanding warrant for having previously shot Waller, and Matlock was fearful that he could be incarcerated for life. While in custody, Matlock convinced Alexander and Watson to kill Waller upon their imminent release. Watson got defendant to drive a vehicle. Defendant, Watson, and Alexander formulated a plan to lure Waller from his home and shoot him. After a trial run, Watson dropped out. Defendant, Alexander, and another man killed the 57-year-old Waller at his home. Matlock and Watson testified against defendant, although Watson, who had already been sentenced pursuant to his plea bargain, changed his story at trial in an apparent attempt to exonerate defendant.

-1-

On appeal, defendant argues that his trial counsel provided ineffective assistance in several respects, that the evidence was insufficient to support his convictions—which were also against the great weight of the evidence, and that the trial court erred in issuing the judgment of sentence. We disagree.

## I. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

An evidentiary hearing was held on the question of ineffective assistance of counsel, *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973); thus, this issue is preserved. See *People v Payne*, 285 Mich App 181, 188; 774 NW2d 714 (2009). The trial court's factual findings are reviewed for clear error. *People v Brown*, 205 Mich App 503, 504-505; 517 NW2d 806 (1994). Clear error occurs where the Court reviews the entire record and "is left with a definite and firm conviction that a mistake has been made." *Id*. at 505. The constitutional question of whether an attorney's ineffective assistance deprived a defendant of his Sixth Amendment right to counsel, US Const, Am VI, is reviewed de novo. *People v Unger* (*On Remand*), 278 Mich App 210, 242; 749 NW2d 272 (2008).

A defendant's right to the effective assistance of counsel is guaranteed by the United States and Michigan Constitutions, US Const, Am VI; Const 1963 art 1, § 20. *People v Cline*, 276 Mich App 634, 637; 741 NW2d 563 (2007). To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance was deficient, i.e., fell below an objective standard of reasonableness, and prejudiced the defense. *People v Taylor*, 275 Mich App 177, 186; 737 NW2d 790 (2007); *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007). The performance will be deemed to have prejudiced the defense if it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different." *Id*. The "effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise." *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001).

**Alibi witness**

Defendant first argues that his trial counsel failed to investigate or present to the jury testimony from an alibi witness, Shallena Cummings, whom defendant had suggested as a witness. At the *Ginther* hearing, defendant stated that he informed his trial counsel, Michael McCarthy, that he had been with Cummings (whom he only knew as "little momma") at the time of the crime, and that McCarthy responded that he should not tell anyone because of Cummings's age. Cummings testified that she shared a child with defendant, and that she was at defendant's home from 10:00 a.m. to 7:00 p.m. on the date of the crime (January 1, 2015). However, she could not remember the location of the home. She stated that defendant's girlfriend was not home so she and defendant were babysitting and having sex, and that his girlfriend did not come home before she left. Cummings also reported that during the trial she twice phoned defendant's trial attorney, whose name she could not recall, on his cell phone, but she did not leave any message.

McCarthy explained that defendant sent him a letter in December 2015 stating generally that he had alibis, and asking whether they could inform the court of the alibis without requiring the witnesses to testify. McCarthy asserted that he responded, and that defendant never identified his alibi witness or any alibi. Defendant acknowledged that McCarthy sent him a letter

asking for more information about alibi witnesses. McCarthy stated that no possible alibi witness contacted him, including Cummings, and that he would have called back had he received a voice mail message or a message from his secretary. McCarthy opined that an alibi witness who did not come forward until late in the proceedings would have credibility problems and that he would be reluctant to present such a witness to the jury because the witness would not appear to be credible. McCarthy said that he had an investigator appointed from the beginning of November 2015 to sometime in February 2016, and that he would have utilized this investigator to investigate any identified alibi.

Defense counsel's duty is to prepare, investigate, and present all substantial defenses. *In re Ayres*, 239 Mich App 8, 22; 608 NW2d 132 (1999). To overcome the presumption of sound trial strategy, the defendant must show that the failure to prepare for trial or interview witnesses resulted in counsel's ignorance of valuable evidence that would have substantially benefited the accused. *People v Bass*, 223 Mich App 241, 252-253; 581 NW2d 1 (1997). "Furthermore, the failure to call witnesses only constitutes ineffective assistance of counsel if it deprives the defendant of a substantial defense." *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "A substantial defense is one that might have made a difference in the outcome of the trial." *People v Chapo*, 283 Mich App 360, 371; 770 NW2d 68 (2009) (quotation marks and citation omitted).

Here, had McCarthy known that Cummings would provide alibi testimony, and McCarthy failed to investigate or present the testimony, McCarthy's performance might have deprived defendant of a substantial alibi defense. However, the evidence indicated that McCarthy was informed generally that defendant might have had an alibi, and that McCarthy sought more information from defendant. The trial court found that the performance of defendant's trial counsel was not deficient because defendant did not make a good-faith effort to inform McCarthy of his intention to pursue an alibi defense. Ultimately, the evidence indicated that McCarthy was unaware of Cummings because defendant was unable to specifically identify her, and Cummings did not provide information to McCarthy. Thus, there is no evidence to show that McCarthy did not adequately pursue Cummings's possible alibi testimony.

Even if McCarthy had been aware of the specific alibi testimony, despite defendant's inability to identify Cummings or provide an address, Cumming's testimony could have been challenged. First, according to defendant, he was discouraged from pursuing her as a witness because she was apparently younger in age, possibly creating additional criminal liability and an adverse reaction from the jury. Also, Cummings could not state the location at which she visited defendant and testified that they were having sex and selling marijuana while they were babysitting defendant's child, who was also the child of his girlfriend. This evidence could have adversely impacted Cummings's credibility as well as the jury's opinion of defendant. Cummings's credibility would also have been questioned because she said she was alone with defendant until 7:00 p.m., whereas defendant's girlfriend testified that she came home around 4:00 p.m. and that only defendant and another person were present. " '[D]ecisions regarding what evidence to present and whether to call or question witnesses are presumed to be matters of trial strategy,' which we will not second-guess with the benefit of hindsight." *Dixon*, 263 Mich App at 398, quoting *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). Here, there was no record evidence that trial counsel failed to investigate Cummings, that trial counsel failed

to make a reasoned decision not to present her as an alibi witness, or that defendant was denied a substantial defense.

### Impeaching Matlock's credibility

Defendant asserts that his trial counsel failed to impeach Matlock. "Counsel may provide ineffective assistance if counsel unreasonably fails to develop the defendant's defenses by adequately impeaching the witnesses against the defendant." *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Prejudice may result where trial counsel fails to introduce evidence that would impeach a witness and corroborate defendant's testimony. *People v Trakhtenberg*, 493 Mich 38, 57; 826 NW2d 136 (2012).

Defendant argues that his trial counsel should have attacked Matlock's testimony with information that Watson provided at an investigative subpoena hearing. Watson had claimed that Matlock wanted defendant dead because they were involved with the same woman, and because Matlock thought that defendant would implicate him in the crime. At the *Ginther* hearing, defendant said that Matlock had become angry with him in November 2014 because they were seeing the same woman. McCarthy stated that his defense plan included discrediting the witnesses, like Matlock, who had identified defendant as being involved, by exposing bias. McCarthy said that he elicited testimony from Watson about defendant's conflict with Matlock, but not specifically that Matlock wanted to kill defendant, which Matlock could have denied. McCarthy's strategy to discredit Matlock included highlighting lies that he had told, and exposing that it was in his self-interest to testify against defendant. The trial court found that counsel adequately attacked Matlock's credibility.

At trial, defendant's trial counsel repeatedly asked Matlock about his self-interested motivation to testify against defendant. Matlock testified that he was helping himself obtain an agreeable sentence by implicating defendant and was avoiding possible life sentences for the assault with intent to murder Waller in 2010 and the first-degree murder and conspiracy charges in this case. Matlock had pleaded guilty to the 2010 assault charge and to second-degree murder for the instant case in exchange for a minimum sentence of between 17 to 40 years and his testimony in the instant case. On cross-examination, McCarthy elicited that Matlock had previously lied to the police and in another court to serve his needs. Matlock also testified that he and defendant had "a big dispute" after Matlock's release from jail, although he could not remember the details. Additionally, during McCarthy's cross-examination of Watson, Watson testified that Matlock was angry with defendant before Waller's murder because Matlock had discovered that defendant was involved with Matlock's girlfriend. Watson had additionally testified on direct that defendant and Matlock had a dispute after Matlock was released from jail about using the assault rifle that defendant had stolen from his uncle.

Thus, McCarthy's trial strategy to attack Matlock's credibility did not include asking either Matlock or Watson about Matlock's statement about wanting to kill defendant. However, McCarthy testified that he was not sure of the response that Matlock would provide, and that asking Watson specifically what Matlock had said may have been calling for inadmissible hearsay. It was reasonable trial strategy to avoid asking a question that Matlock may have denied because he would not have wanted to provide testimony favorable to defendant. Even without testimony about the extent of Matlock's animosity toward defendant, the jury was

informed of the animosity and how it could have motivated Matlock. Most importantly, much of counsel's cross-examination of Matlock focused on providing the jury with information about Matlock's credibility and motive to testify against defendant. The jury was completely aware of the possible motives for Matlock's testimony against defendant, and McCarthy ensured that the jury would consider this information in making its credibility determination about Matlock.

**Ballistics expert**

Defendant argues that trial counsel was deficient for failing to challenge the ballistics evidence presented by firearms and toolmark expert Detective Sergeant Dean Molnar, or to request an expert to counter Molnar. Molnar testified that the marks on the shell casings indicated that the shell casings collected from Waller's home were fired from the same gun as the shell casings found in the yard of a home in which defendant had lived. The casings collected at defendant's former home were collected one year before Waller's murder, after a nearby home had been repeatedly shot at.

Defendant first contends that the ballistics evidence should have been challenged based on questions about the reliability of toolmark evidence. MRE 702 provides for the admission of expert opinion that results from "scientific, technical, or other specialized knowledge," and assists the trier of fact. To determine whether such testimony is admissible, a searching inquiry is mandated. The inquiry is not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from the data. *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). The preliminary determination of the qualification of an expert is an issue for the trial court to decide. *Id.* at 780. The admissibility of expert testimony is in the trial court's discretion. *Unger*, 278 Mich App at 216. The trial court must consider many factors to determine "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v Merrell Dow Pharm, Inc*, 509 US 579, 592-593; 113 S Ct 2786; 125 L Ed 2d 469 (1993). The data underlying the expert's theories and the methodology by which he draws his conclusions, as well as his opinion, must also be reliable. *People v Yost*, 278 Mich App 341, 394; 749 NW2d 753 (2008), quoting *Gilbert*, 470 Mich at 782.

Defendant cites a Supreme Court order denying leave to appeal in *People v McAdoo*, 497 Mich 975; 859 NW2d 711 (2015), where in a concurring opinion Justice McCormack concluded that "there are serious questions about whether [toolmark] evidence has an adequate scientific foundation," based on several studies regarding the accuracy of toolmark evidence used for identity. Defendant, likewise, cites studies questioning the scientific validity of toolmark evidence in his brief on appeal.

Regarding the ballistic evidence, McCarthy testified that his strategy was to demonstrate that there was no evidence that defendant was involved with shooting a gun, particularly because defendant had been evicted from the home where the shell casings were found. The trial court concluded that defendant had not established that Detective Sergeant Molnar should not have been qualified as an expert or that his methodology was defective. There is no authority establishing that toolmark evidence does not meet the tests for scientific validity necessary to assist the trier of fact as discussed in *Gilbert*, 470 Mich 749, and *Daubert*, 509 US 579. Thus, it

is questionable whether defendant's trial counsel could have effectively challenged the validity of this evidence. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

Defendant further argues that his trial counsel should have requested funds to obtain an expert in toolmarks to challenge Detective Sergeant Molnar's testimony. Trial counsel's decision regarding whether to call an expert witness is a matter of trial strategy. *Payne*, 285 Mich App at 190. Defendant does not explain how an expert would have contradicted Detective Sergeant Molnar's conclusion that shell casings from two different areas were fired from the same gun, other than to attack the validity of toolmark identifications generally. Again, McCarthy's strategy was to demonstrate that Alexander was the person who shot Waller, and that there was no evidence that defendant was involved with shooting a gun. The trial court concluded that defendant had not established that an alternative expert would have testified in his favor, or that challenging Molnar's testimony would have made a difference in the outcome of the trial, and denied defendant's motion for funds to retain a firearms expert.

Trial counsel presented evidence that defendant had been evicted, around December 2015, from the home where the casings were found. Defendant has not demonstrated that his trial counsel's strategy to rely on the lack of evidence that defendant used a gun was improper. Additionally, to establish an ineffective assistance claim, it must be demonstrated that it is reasonably probable that, but for counsel's error, "the result of the proceeding would have been different." *Jordan*, 275 Mich App at 667. Excluding or challenging Molnar's testimony could not have exonerated defendant.

## II. SUFFICIENCY AND GREAT WEIGHT OF THE EVIDENCE

Defendant argues that the verdict was against the great weight of the evidence, an issue he did not preserve, and that the evidence was insufficient to convict him. This Court reviews unpreserved issues involving the great weight of the evidence for plain error affecting the defendant's substantial rights. *People v Musser*, 259 Mich App 215, 218-219; 673 NW2d 800 (2003), citing *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). Reversal is warranted only if the plain error resulted in the conviction of an innocent defendant or if "the error seriously affected the fairness, integrity, or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763. This Court reviews de novo a challenge to the sufficiency of the evidence. *Ericksen*, 288 Mich App at 195.

Due process, US Const, Am XIV, requires that evidence of every element of a crime be proved beyond a reasonable doubt in order to sustain a criminal conviction. *People v Hampton*, 407 Mich 354, 366; 285 NW2d 284 (1979), citing *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). To determine if the prosecutor produced evidence sufficient to support a conviction, this Court considers "the evidence in the light most favorable to the prosecutor" to ascertain "whether a rational trier of fact could find the defendant guilty beyond a reasonable doubt." *People v Tennyson*, 487 Mich 730, 735; 790 NW2d 354 (2010), quoting *People v Hardiman*, 466 Mich 417, 429; 646 NW2d 158 (2002). Direct and circumstantial evidence, as well as all reasonable inferences that may be drawn, are considered to determine

whether the evidence was sufficient to sustain the defendant's conviction. *Id.* In reviewing the sufficiency of the evidence, this Court "is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *People v Gonzalez*, 468 Mich 636, 640-641; 664 NW2d 159 (2003), quoting *People v Nowack*, 462 Mich 392, 399-400; 614 NW2d 78 (2000).

Defendant contends that the evidence was insufficient to convict him of aiding and abetting second-degree murder, and conspiracy to commit first-degree murder. Defendant's central argument is that he was not identified as being present at the scene of the shooting. "[I]dentity is an element of every offense." *Yost*, 278 Mich App at 356.

However, defendant's identity in planning and executing Waller's murder was established beyond a reasonable doubt by the testimonies of defendant's friend, Kierra Hobbs, as well as Matlock and Watson. The reason for killing Waller was that Matlock had shot him in 2010 and Waller could have implicated Matlock in that shooting. Matlock and Watson testified about how Matlock had repeatedly asked Alexander and Watson to "take care of," or kill Waller; Matlock could not do so because he was being held on a warrant for the 2010 shooting. Alexander and Watson agreed to help Matlock by killing Waller. Defendant told Hobbs that he was asked to kill someone after she heard him discuss the issue on the phone. Hobbs then witnessed defendant planning with Alexander and Shawn Pearson to lure someone from their home in order to kill them by promising to pay rent. Watson's former testimony was similar to Hobbs's testimony that defendant had planned the murder with him at defendant's home, and then distributed the weapons. Officer LeDawn Russell, the next-door neighbor, noted that Waller was a landlord.

Hobbs also witnessed defendant leave in his brown Buick with two other men and guns on the day that Waller was murdered. Witnesses saw a gold or light-brown car initiate contact with Waller in his driveway, and Waller was murdered consistent with the plan that defendant put forth with his associates in front of Hobbs. Defendant celebrated news reports of Waller's killing, boasted to Hobbs about the killing, and showed her blood from the killing in his brown Buick. Defendant's girlfriend, Anarika Dafney, testified that defendant had access to a tan or gold Buick at the time, and defendant had been stopped by police while driving a gold or tan sedan Buick three times, on November 4, 2014, November 25, 2014, and January 28, 2015. Dafney and a neighbor testified that Dafney sold a gold Buick to the neighbor for $200 near the time that defendant was incarcerated for this crime.

At a January 5, 2015 gathering, Alexander was heard describing being in a gold Buick when he participated in killing Waller in a way that was consistent with defendant's plan as reported by Hobbs. According to Matlock, at the gathering, defendant boasted of participating in Waller's killing, including how he lured Waller to the shooting. Watson's recanted testimony was consistent with other testimony establishing that defendant was the driver, and that Matlock thanked him at the gathering.

Defendant argues that the testimony of Matlock and Hobbs was not credible because of the favorable plea deals they made in exchange for their testimony, as well as Hobbs' use of drugs. However, the jury heard all of this evidence and was tasked with determining the credibility of the witnesses. An appellate court "does not interfere" with the fact-finder's

-7-

"assessment of the weight and credibility of witnesses or the evidence[.]" *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013). The trier of fact determines "what inferences may be fairly drawn from the evidence" and "the weight to be accorded those inferences." *People v Henderson*, 306 Mich App 1, 9; 854 NW2d 234 (2014), quoting *Hardiman*, 466 Mich at 428. "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Gonzalez*, 468 Mich at 640-641, quoting *Nowack*, 462 Mich at 399-400. Based on these credibility determinations and the evidence, a rational juror could have found beyond a reasonable doubt that defendant planned and participated in Waller's murder.

Defendant further argues that the evidence of conspiracy to commit first-degree murder was insufficient because the jury found that he was guilty of second-degree murder, which did not involve the premeditation element required for first-degree murder. See *People v Bennett*, 290 Mich App 465, 472; 802 NW2d 627 (2010). Defendant argues that, if the second-degree murder of Waller was unplanned, then defendant could not be guilty of having planned it. It is possible that the jury found that defendant agreed with at least Alexander to accomplish the premeditated killing of Waller by luring him out to the car, but that the jury concluded defendant was an accomplice to Alexander and one other person's intentional killing of Waller that was done without premeditation, but with malice, when the assailants chased Waller into his home. Nonetheless, the evidence was sufficient to demonstrate that defendant agreed to participate in the premeditated killing of Waller, and that he did participate in Waller's murder by driving the car and attempting to lure him outside. Notably, while independently considering two separate offenses, a jury in a criminal case may reach different conclusions concerning the identical element contained in both offenses. *People v Goss*, 446 Mich 587, 597; 521 NW2d 312 (1994). A jury may reach inconsistent verdicts as a result of mistake, compromise, or leniency. *Id.* at 597-598. The jury can choose, without any apparent logical basis, what to believe and what to disbelieve because the jury is the sole judge of all the facts. *People v Vaughn*, 409 Mich 463, 466; 295 NW2d 354 (1980). The verdicts are not inconsistent where there is an interpretation of the evidence that provides a logical explanation for the findings of the jury. *People v Tombs*, 472 Mich 446, 462-463; 697 NW2d 494 (2005).

Regarding the great weight of the evidence, a trial court should grant a new trial based on the weight of the evidence only where the evidence preponderates heavily against the verdict so that it is a serious miscarriage of justice to allow the verdict to stand. *People v Gadomski*, 232 Mich App 24, 28; 592 NW2d 75 (1998), citing *People v Lemmon*, 456 Mich 625, 627; 576 NW2d 129 (1998). A trial court may order a new trial in the "interest of justice" or to prevent a "miscarriage of justice." *Id*. at 634-635. A trial court may vacate a verdict only when it does not find reasonable support in the evidence, and the verdict was "more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).

Defendant noted the lack of physical evidence and eyewitness testimony of defendant's involvement, even though both Officer Russell, from next door, and Lawrence Harris witnessed the gold Buick in Waller's driveway. Both described the driver, distinctly, and did not identify defendant. However, it was not discussed how clearly the witnesses saw the driver of the vehicle from inside their homes, particularly considering that they had to quickly seek safety from the gunshots. Importantly, neither witness stated that defendant did *not* appear to be the driver of the

vehicle, in contrast to the testimonial evidence identifying defendant as the driver of the vehicle. Further, there was no physical evidence to contradict the testimonial evidence that defendant was involved in the planning and execution of Waller's death.

Defendant notes that there were other vehicles similar to the one used in the murder in the area because the police had impounded a vehicle reported by Officer Russell and found that it was not the vehicle used in the crime. However, a tan or gold Buick was used in the crime, and defendant had access to and was cited while driving the same type of vehicle in the months preceding and following the crime. That the police did not recover the vehicle does not contradict the fact that defendant drove the vehicle as a part of the crime.

Defendant also argues that the ballistics evidence, indicating that the shell casings at the murder scene were fired from the same gun as the shell casings found in the backyard of defendant's former home, do not provide a link between defendant and the murder. Because it was not demonstrated, or alleged, that defendant fired the weapon at either location, it is true that this evidence could not demonstrate that defendant shot Waller. The jury was empowered to weigh the evidentiary value that the gun used to kill Waller had also been fired on defendant's property. Notably, this evidence does not exclude the possibility that defendant participated in planning and executing the murder.

Finally, defendant argues that the credibility issues of Matlock, Hobbs, and Watson should have prevented the jury from determining that defendant was guilty. Matlock and Hobbs testified pursuant to plea deals in order to achieve more favorable sentences, and defendant's trial counsel elicited testimony that Hobbs had abused drugs and that Matlock had opportunistically lied. Defendant asserts that Watson's previous testimony could not be trusted because he recanted, and notes that the prosecutor did not charge another individual whom Watson had implicated. However, the jury heard the entirety of the testimony and was responsible for making credibility determinations. "In general, conflicting testimony or a question as to the credibility of a witness are not sufficient grounds for granting a new trial." *Lemmon*, 456 Mich at 643. Unless there are "exceptional circumstances," the jury determines the credibility of witnesses and the reviewing court may not substitute its view on credibility, an issue that the constitution guarantees is in the province of the jury. *Id*. at 642. Even where the "testimony is in direct conflict and testimony supporting the verdict has been impeached," because the jury determined credibility, "it cannot be said as a matter of law that the testimony thus impeached was deprived of all probative value or that the jury could not believe it." *Id*. at 643. "Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial." *Lacalamita*, 286 Mich App at 469-470, quoting *Lemmon*, 456 Mich at 647. Thus, the verdict was not against the great weight of the evidence and defendant has not demonstrated plain error.

III. JUDGMENT OF SENTENCE

Defendant next argues that the trial court erred by imposing a life without parole sentence. We disagree.

The trial court sentenced defendant for conspiracy to commit first-degree murder by stating, "[P]ursuant to the statute I'm going to sentence you to life with the possibility of parole."

-9-

However, the judgment of sentence provides that defendant was sentenced to life *without* the possibility of parole for this conviction. The conspiracy statute, MCL 750.157a(a), provides, in relevant part:

> [I]f commission of the offense prohibited by law is punishable by imprisonment for 1 year or more, the person convicted under this section shall be punished by a penalty equal to that which could be imposed if he had been convicted of committing the crime he conspired to commit.

Thus, the trial court was required to sentence defendant to the sentence prescribed by the first-degree murder statute. MCL 750.316 provides that a defendant who commits a premeditated killing "is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole." Thus, the trial court was required to sentence defendant to life *without* the possibility of parole, and the judgment of sentence is legally correct.

Defendant cites *People v Jahner*, 433 Mich 490, 504; 446 NW2d 151 (1989), where the Court analyzed the conspiracy, first-degree murder, and "lifer" statues,[1] and concluded that "a person sentenced to life imprisonment for conspiracy to commit first-degree murder is eligible for parole consideration[.]" However, the first-degree murder statute, MCL 750.316, was amended in 2014 and now includes the requirement that those convicted of first-degree murder "shall be punished by imprisonment for life without eligibility for parole." Thus, *Jahner* did not consider a first-degree murder statute that included the life without parole language. Where a judgment of sentence does not include a statutorily mandated punishment, the sentence is invalid. *People v Comer*, 500 Mich 278, 292; 901 NW2d 553 (2017). Had the trial court sentenced defendant to life with the possibility of parole, the sentence would have been invalid and subject to correction pursuant to the previous version of MCR 6.429. Thus, the trial court did not plainly err by issuing the judgment of sentence.

Affirmed.

/s/ Thomas C. Cameron
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro

---

[1] As stated in *Jahner*, 433 Mich at 506, MCL 791.234(4) provided, in relevant part that "[a] prisoner under sentence for life or for a term of years, other than prisoners sentenced for life for murder in the first degree and prisoners sentenced for life or for a minimum term of imprisonment for a major controlled substance offense, who has served 10 calendar years of the sentence is subject to the jurisdiction of the parole board and may be released on parole by the parole board . . . ."